**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PAUL BRAUNSTEIN, DBA Baseplans
USA,
　　　　　　*Plaintiff-Appellant,*

　　　　　v.

ARIZONA DEPARTMENT OF
TRANSPORTATION; VICTOR MENDEZ;
LISA WORMINGTON; SUSAN TELLEZ;
STATE OF ARIZONA,
　　　　　　*Defendants-Appellees.*

No. 10-16564

D.C. No.
2:06-cv-02726-JWS

PAUL BRAUNSTEIN, DBA Baseplans
USA,
　　　　　　　　　*Plaintiff,*

　　　　　and

GARY E. LOFLAND; PAUL S.
GERDING, Jr., counsel for plaintiff,
　　　　　　　　　*Appellants,*

　　　　　v.

ARIZONA DEPARTMENT OF
TRANSPORTATION; VICTOR MENDEZ;
LISA WORMINGTON; SUSAN TELLEZ;
STATE OF ARIZONA,
　　　　　　*Defendants-Appellees.*

No. 10-17193

D.C. No.
2:06-cv-02726-JWS

OPINION

Appeal from the United States District Court
for the District of Arizona
John W. Sedwick, District Judge, Presiding

Argued and Submitted
October 14, 2011—San Francisco, California

7653

Filed June 27, 2012

Before: Procter Hug, Jr., Andrew J. Kleinfeld, and
William A. Fletcher, Circuit Judges.

Opinion by Judge William A. Fletcher

## COUNSEL

Paul S. Gerding, KUTAK ROCK LLP, Scottsdale, Arizona, and Gary Edward Lofland, LOFLAND & ASSOCIATES, Yakima, Washington, for the appellant.

Melissa Alice Parham, Kelly Y. Schwab, Michelle Hibbert Swann, CURTIS GOODWIN SULLIVAN UDALL & SCHWAB PLC, Phoenix, Arizona, and Kiersten A. Murphy, Kevin E. O'Malley, GALLAGHER & KENNEDY, P.A., Phoenix, Arizona, for the appellees.

## OPINION

W. FLETCHER, Circuit Judge:

Plaintiff Paul Braunstein seeks damages based on Arizona's use of an affirmative action program in its award of a 2005 transportation engineering contract. We affirm the district court's holding that Braunstein lacks Article III standing.

### I.   Background

Braunstein owns and operates BasePlans, a small engineering and land surveying firm in Arizona that previously performed work for the Arizona Department of Transportation ("the Department"). The Department is a state agency responsible for the planning, design, repair, and construction of roads in Arizona. Beginning in 2003, Braunstein filed three lawsuits against the Department and its employees challenging their refusal to award him additional work. He filed the first two suits in state court alleging, *inter alia*, breach of contract, conspiracy, and antitrust violations. In 2006, Braunstein filed the present lawsuit in federal court, alleging that the Department's race- and gender-conscious affirmative action program violated his right to equal protection.

In 1995, the Department hired the engineering firm DMJM Harris, Inc. ("DMJM"), as its prime contractor for the Maricopa County regional freeway system. Initially, the Department itself hired other firms, including BasePlans, on an as-needed basis to locate subsurface utilities that might need to

be relocated during freeway construction. In 2001, the Department opted for a new contracting system under which the prime contractor, rather than the Department, selected and contracted with other firms for the utility location work. DMJM chose Aztec Technical Services ("Aztec") as its utility subcontractor, and the Department modified its contract with DMJM accordingly.

In March 2003, Braunstein sued the Department, a Department official, DMJM, and Aztec in Arizona state court, alleging that they secretly and improperly conspired to divert utility location work to Aztec. Braunstein alleged breach of contract by the Department and intentional interference with business expectancy by the other defendants. In June 2004, the court granted summary judgment in favor of DMJM and Aztec. The court found, among other things, that DMJM did not ask BasePlans to submit a subcontracting proposal because it had experienced problems with BasePlans on prior projects. In December 2004, Braunstein settled his breach of contract claim with the Department and dismissed his claims against the Department official.

In November 2004, the Department solicited bids for a new engineering and design contract to replace DMJM's 1995 contract. Six firms bid on the prime contract. Braunstein did not bid on the contract because he could not satisfy a Department requirement that prime contractors be able to complete 50 percent of the contract work themselves. Instead, Braunstein contacted the bidding firms to ask about subcontracting for the utility location work. All six firms rejected Braunstein's overtures, and Braunstein did not submit a quote or subcontracting bid to any of them. None of the prime bids submitted to the Department identified BasePlans as a chosen utility location subcontractor.

United States Department of Transportation regulations require that states receiving federal highway funds maintain a Disadvantaged Business Enterprise ("DBE") program. 49

C.F.R. § 26.21. To qualify as a DBE, a "for-profit small business" must be "at least 51 percent owned by one or more individuals who are both socially and economically disadvantaged." *Id.* § 26.5. The regulations presume that women, Black Americans, Hispanic Americans, Native Americans, Asian-Pacific Americans, Subcontinent Asian Americans, and certain other ethnic minorities are socially and economically disadvantaged. *Id.* § 26.67(a)(1). The presumption of disadvantage is rebutted when an individual has a personal net worth above a specified amount. *Id.* § 26.67(b)(1).

The Department reviewed the prime contract bids and scored them on a 100-point scale. Under the Department's system, a bidding prime contractor would receive a maximum of 5 points for DBE participation if (1) it was a DBE itself; (2) it committed to hiring DBE subcontractors to perform at least 6 percent of the contract work; or (3) it demonstrated a "good faith effort" to achieve the 6 percent goal but was unable to do so for reasons beyond its control. The Department required that contracting firms adhere to their DBE participation commitments and file monthly DBE compliance reports.

All six firms that bid on the 2005 prime contract received the maximum 5 points for DBE participation. No bidding firm was itself a DBE, but all six committed to hiring DBE subcontractors to perform at least 6 percent of the work. Only one of the six bidding firms selected a DBE as its desired utility location subcontractor. Three of the bidding firms, including DMJM, selected Aztec to perform the utility location work. Aztec was not a DBE.

DMJM won the bid for the 2005 contract. The contract was for one year, but the Department indicated that it expected to renew the contract annually for 20 years. The Department would decide whether to renew it based on DMJM's perfor-

mance. DMJM's use of DBE subcontractors in future years would not factor into the Department's renewal decision.

In May 2005, Braunstein filed a second lawsuit in Arizona state court against the Department and Department officials, alleging conspiracy and violation of antitrust, public records, and conflict of interest laws. The Superior Court dismissed all of Braunstein's claims, and the Court of Appeals affirmed. The state courts concluded that Braunstein lacked standing to bring the claims under state law because he had not bid on the challenged contract.

Also in May 2005, we decided *Western States Paving Co. v. Washington State Department of Transportation*, 407 F.3d 983 (9th Cir. 2005). We upheld against a facial challenge the federal DBE program at the national level as a narrowly tailored means of remedying race- and sex-based discrimination in the transportation contracting industry. *Id.* at 995. However, we held that states, to survive an as-applied challenge to their own DBE programs, must produce evidence of discrimination against particular groups within particular state industries to demonstrate that their DBE programs are narrowly tailored to achieve Congress's compelling remedial interest. *Id.* at 995-99. We struck down the Washington Department of Transportation's DBE program as unconstitutional because the record was "devoid of any evidence" of discrimination in the state's transportation contracting industry. *Id.* at 1002. In January 2006, the Department suspended its DBE program in light of *Western States*.

In November 2006, Braunstein brought this suit in federal court against the Department, the state of Arizona, and three named Department employees (the "Named Defendants") in their official and individual capacities. Braunstein's federal suit challenged Arizona's DBE program as violating the Equal Protection Clause of the Fourteenth Amendment and Title VI of the Civil Rights Act. Title VI provides that no person shall be subjected to discrimination under "any program

or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. The attorney who litigated *Western States* represents Braunstein in this suit.

Braunstein alleged that the Department violated his right to equal protection by using race and gender preferences in its solicitation and award of the 2005 contract. He alleged that these preferences prevented him, as a non-minority business owner, from competing for subcontracting work on an equal basis. Braunstein sought: (1) declaratory relief that the DBE program is unconstitutional; (2) damages based on 42 U.S.C. §§ 1981, 1983, and 2000d; and (3) an injunction prohibiting Defendants from implementing the DBE program.

In September 2007, the district court dismissed the §§ 1981 and 1983 claims against the state, the Department, and the Named Defendants in their official capacities because of sovereign immunity under the Eleventh Amendment. The court found that Braunstein alleged sufficient injury to survive a motion to dismiss for lack of standing, but warned that "[t]his is not to say that after appropriate discovery a motion for summary judgment would not succeed." In May 2008, the district court dismissed the § 2000d damages claims against the Named Defendants because that provision does not provide for monetary relief against individual defendants.

In May 2010, after the parties had finished discovery and filed cross motions for summary judgment, the district court dismissed as moot Braunstein's claims for injunctive and declaratory relief because the Department had suspended its DBE program in 2006. This left only Braunstein's damages claims against the state and the Department under § 2000d, and against the Named Defendants in their individual capacities under §§ 1981 and 1983. The court questioned *sua sponte* whether Braunstein had Article III standing to pursue these remaining claims and ordered him to show cause demonstrating a redressable injury. The court wrote that it was "difficult to see how Braunstein was harmed by the DBE program."

In June 2010, the district court concluded that Braunstein lacked Article III standing to pursue his remaining claims because he had failed to show that the Department's DBE program had affected him personally. The court noted that "Braunstein was afforded the opportunity to bid on subcontracting work, and the DBE goal did not serve as a barrier to doing so, nor was it an impediment to his securing a subcontract." The court found that Braunstein's inability to secure utility location work stemmed from his past unsatisfactory performance for DMJM, not his status as a non-DBE. "[T]he reason Braunstein did not get any of the utility subcontract work from the successful bidder on [the 2005 contract] had nothing to do with the fact that he did not qualify for DBE status," the court wrote. "Rather, he did not get any of the work because those who were in a position to provide it did not want to do business with Braunstein."

In September 2010, the district court awarded Defendants attorneys' fees under 42 U.S.C. § 1988 because "Braunstein and his lawyer persisted in pursuing claims long after it became clear they lacked merit." The court also imposed sanctions against Braunstein's attorneys under 28 U.S.C. § 1927 for unreasonably prolonging the proceedings.

Braunstein and his attorneys timely appealed.

## II.   Standard of Review

We review *de novo* the district court's conclusion that a plaintiff lacks Article III standing. *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1173 (9th Cir. 2004). We review for abuse of discretion an award of attorneys' fees under 42 U.S.C. § 1988, *Edgerly v. City & Cnty. of S.F.*, 599 F.3d 946, 962 (9th Cir. 2010), and an imposition of sanctions under 28 U.S.C. § 1927, *Lahiri v. Universal Music & Video Distrib. Corp.*, 606 F.3d 1216, 1218 (9th Cir. 2010).

## III. Discussion

### A. Standing

To satisfy Article III standing, a plaintiff must show (1) he has suffered an "injury in fact" that is concrete and particularized and actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Bernhardt v. Cnty. of L.A.*, 279 F.3d 862, 868-69 (9th Cir. 2002) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81 (2000)). The plaintiff bears the burden of establishing these elements. Although general allegations of injury can suffice at the pleading stage, the plaintiff must set forth "specific facts" to survive a motion for summary judgment based on lack of standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). "A suit brought by a plaintiff without Article III standing is not a 'case or controversy,' and an Article III federal court therefore lacks subject matter jurisdiction over the suit." *Cetacean Cmty.*, 386 F.3d at 1174 (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998)).

**[1]** The Supreme Court has articulated a broad conception of Article III standing to bring equal protection challenges. In *Northeastern Florida Chapter of Associated General Contractors of America v. City of Jacksonville, Florida*, 508 U.S. 656, 658-59 (1993), plaintiff construction firms challenged an affirmative action program that set aside 10 percent of city contracts for Minority Business Enterprises. The Court described their injury-in-fact as "the inability to compete on an equal footing in the bidding process, not the loss of a contract." *Id.* at 666. The Court explained:

> When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a

member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing. The "injury in fact" in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit.

*Id.*; *see also Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 280 n.14 (1978) (principal opinion by Powell, J.) (plaintiff challenging a medical school affirmative action program need not prove that he would have been admitted absent the challenged program because his injury was the inability to compete for all seats in the entering class). The same rule applies where, as here, a prospective subcontractor challenges a government program that gives general contractors a financial incentive to hire minority-owned subcontractors. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 210-12 (1995).

We applied this rule in *Bras v. California Public Utilities Commission*, 59 F.3d 869, 873-74 (9th Cir. 1995), where we held that a plaintiff architect had standing to challenge a state law that established aspirational affirmative action goals, rather than strict set-aside quotas, for using minority- and women-owned businesses in public utility contracts. Similarly, in *Monterey Mechanical Co. v. Wilson*, 125 F.3d 702, 704, 707 (9th Cir. 1997), *reh'g denied*, 138 F.3d 1270 (9th Cir. 1998), we held that a general contractor had standing to challenge a state law requiring bidders on public contracts to show a "good faith effort" to hire a certain percentage of minority- and women-owned subcontractors. *Id.*

**[2]** However, Article III standing to bring an equal protection challenge is not without limits. The rule that a plaintiff must assert a particularized injury, rather than a generalized grievance, "applies with as much force in the equal protection context as in any other." *United States v. Hays*, 515 U.S. 737, 743 (1995). Even if the government has discriminated on the

basis of race, only those who are "personally denied" equal treatment have a cognizable injury under Article III. *Allen v. Wright*, 468 U.S. 737, 755 (1984) (internal quotation omitted); *see also Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 489 n.26 (1982) (rejecting the notion that every citizen has standing to challenge an affirmative action program). Thus, in *Carroll v. Nakatani*, 342 F.3d 934, 942 (9th Cir. 2003), we held that a plaintiff lacked standing to challenge racial preferences in a government loan program where the plaintiff filed only a "symbolic, incomplete application" and did not demonstrate an "ability to compete" for the loan. *See also Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 166-67 (1972) (plaintiff lacked standing to challenge an organization's racially discriminatory membership policy where he never sought to become a member).

**[3]** Braunstein argues that he has Article III standing because the DBE program prevented him from "competing for subcontracts on an equal basis." It is true that Braunstein challenges an affirmative action program that gave prime contractors an incentive to hire DBE subcontractors. But Braunstein has not provided any evidence showing that the Department's DBE program affected him personally or that it impeded his ability to compete for utility location work on an equal basis.

**[4]** Braunstein wanted the prime bidding firms to select his company as a subcontractor to perform the utility location work under the 2005 contract with the Department. However, unlike the prospective subcontractor plaintiffs in *Adarand*, 515 U.S. at 205, and *Western States*, 407 F.3d at 987, Braunstein did not submit a quote or a bid to any of the prime contractors bidding on the government contract. He merely "contacted" the firms that bid on the contract. As a result, Braunstein is like the plaintiff in *Carroll* who filed an incomplete loan application and "cannot demonstrate he has been denied equal treatment." 342 F.3d at 942.

**[5]** Braunstein argues that, under *Northeastern* and *Bras*, he need only establish that he was "able and ready" to seek subcontracting work under the contract. *Northeastern*, 508 U.S. at 666; *Bras*, 59 F.3d at 873; *see also Gratz v. Bollinger*, 539 U.S. 244, 261-62 (2003) (plaintiff had standing to challenge university's race-conscious transfer admissions policy, even though he never applied as a transfer student, because he demonstrated that he was "able and ready" to do so). However, the plaintiffs in those cases sought prospective relief against government affirmative action programs. *See Northeastern*, 508 U.S. at 659; *Bras*, 59 F.3d at 872; *Gratz*, 539 U.S. at 260-61. Here, the district court dismissed as moot Braunstein's claims for declaratory and injunctive relief because the Department had suspended its DBE program ten months before he brought the suit. Braunstein does not challenge that ruling on appeal. *See Western States*, 407 F.3d at 988 n.2. Because Braunstein's surviving claims are for damages rather than prospective relief, he must show more than that he is "able and ready" to seek subcontracting work. *See Laidlaw*, 528 U.S. at 185 (plaintiff must demonstrate standing separately for prospective and retrospective relief).

As in *Carroll*, Braunstein "has done essentially nothing to demonstrate that he [was] in a position to compete equally" with the other subcontractors. 342 F.3d at 942. He has presented no evidence comparing himself with the other subcontractors in terms of price or other criteria. *See, e.g.*, *Western States*, 407 F.3d at 987 (evidence that plaintiff submitted a lower bid than other firms); *Monterey Mechanical*, 125 F.3d at 704 (same); *Bras*, 59 F.3d at 871 (evidence that plaintiff was "very competitive" with other firms). Nor has he presented evidence explaining why the six prospective prime contractors rejected him as a subcontractor. *See, e.g.*, *Adarand*, 515 U.S. at 205 (describing an affidavit from the prime contractor); *Western States*, 407 F.3d at 987 ("The prime contractor explicitly identified the contract's minority utilization requirement as the reason that it rejected Western States' bid.").

There is nothing in the record indicating that the DBE program posed a barrier that impeded Braunstein's ability to compete for work as a subcontractor. *See Scott v. Pasadena Unified Sch. Dist.*, 306 F.3d 646, 657 (9th Cir. 2002) ("[The] existence of a racial or gender barrier is [not] enough [to establish standing], without a plaintiff's showing that she has been . . . subjected to such a barrier."). To the contrary, the district court found that Braunstein "did not get any of the work because those who were in a position to provide it did not want to do business with Braunstein."

**[6]** In *Texas v. Lesage*, 528 U.S. 18, 21 (1999) (per curiam), the Supreme Court held that, "where there is no allegation of an ongoing or imminent constitutional violation to support a claim for forward-looking relief, the government's conclusive demonstration that it would have made the same decision absent the alleged discrimination precludes any finding of liability." The Court held that the plaintiff graduate school applicant lacked a cognizable injury to challenge the school's affirmative action program under § 1983 because the school presented undisputed evidence that it would have rejected his application regardless of the challenged program. *Id.* at 19-22. As in *Lesage*, Braunstein seeks only damages, and the evidence establishes that he would not have received utility location work under the 2005 contract regardless of the DBE program. Indeed, Braunstein explicitly acknowledged in one of his earlier state court suits that DMJM, the winning bidder on the 2005 contract, would not hire him as a subcontractor for reasons unrelated to the DBE program. Because *Lesage* precludes a finding of liability in such a circumstance, Braunstein lacks Article III standing. *See, e.g.*, *Donahue v. City of Bos.*, 304 F.3d 110, 117-19 (1st Cir. 2002); *Aiken v. Hackett*, 281 F.3d 516, 519-20 (6th Cir. 2002).

At the summary judgment stage, Braunstein was required to set forth "specific facts" demonstrating that the DBE program impeded his ability to compete for the subcontracting work on an equal basis. *Lujan*, 504 U.S. at 561; *see also Whit-*

*more v. Arkansas*, 495 U.S. 149, 155 (1990) ("The litigant must clearly and specifically set forth facts sufficient to satisfy these Art. III standing requirements."). Braunstein's opening brief in this court failed to provide even one citation to record evidence supporting his alleged Article III injury. At oral argument, Braunstein was unable to explain how the DBE program adversely affected him personally. We view the evidence in the light most favorable to the plaintiff when reviewing a grant of summary judgment, but the plaintiff still must present at least "some evidence" establishing each of the three requirements for Article III standing. *Bras*, 59 F.3d at 872-73.

**[7]** Because the district court correctly concluded that Braunstein lacked Article III standing, we affirm the entry of summary judgment in favor of Defendants.

### B.   Attorneys' Fees and Sanctions

The district court awarded attorneys' fees under 42 U.S.C. § 1988 and imposed sanctions under 28 U.S.C. § 1927. We review these rulings in turn.

### 1.   Attorneys' Fees

**[8]** Under § 1988, a court in its discretion may award reasonable attorneys' fees in a suit seeking to enforce §§ 1981, 1983, or 2000d. However, because Congress wanted to encourage individuals to seek relief for violations of their civil rights, § 1988 operates asymmetrically. A prevailing plaintiff may receive attorneys' fees as a matter of course, but a prevailing defendant may only recover fees in "exceptional circumstances" where the court finds that the plaintiff's claims are "frivolous, unreasonable, or groundless." *Harris v. Maricopa Cnty. Superior Court*, 631 F.3d 963, 971 (9th Cir. 2011) (internal quotations omitted). Where the plaintiff asserts both frivolous and non-frivolous claims, only fees attributable exclusively to the plaintiff's frivolous claims are

recoverable. *See id.* at 971-72; *Fox v. Vice*, 131 S. Ct. 2205, 2215 (2011) "Section 1988 permits the defendant to receive only the portion of his fees that he would not have paid but for the frivolous claim."). "[W]here a plaintiff in a § 1983 action alleges multiple interrelated claims based on the same underlying facts, and some of those claims are frivolous and some are not, a court may award defendants attorneys fees with respect to the frivolous claims only when those claims are not 'intertwined.' " *Harris*, 631 F.3d at 973 n.2 (discussing *Tutor-Saliba Corp. v. City of Hailey*, 452 F.3d 1052, 1063-64 (9th Cir. 2006)); *accord Fox*, 131 S. Ct. at 2217 (discussing the "interrelated[ness]" of plaintiffs' frivolous and non-frivolous claims).

Here, the district court cited three reasons for awarding attorneys' fees to the prevailing Defendants under § 1988. First, Braunstein should have known that he lacked Article III standing because he knew that his inability to secure the sub-contracting work "had nothing to do" with the challenged DBE program. Second, Braunstein continued to pursue his § 2000d damages claims against the state and the Department even after he knew that no federal funds were involved in the 2005 contract. Third, Braunstein brought §§ 1981 and 1983 damages claims that were clearly barred by the Eleventh Amendment and thus "frivolous from the outset." We discuss these reasons in turn.

**[9]** First, Braunstein was put on notice early in the litigation that Article III standing would be an important issue. In September 2007, the district court warned Braunstein that, although he had alleged sufficient injury to survive a motion to dismiss, he would have to develop additional facts during discovery to survive summary judgment. Despite this warning, Braunstein failed to present any evidence demonstrating that he had suffered a cognizable Article III injury. However, given the broad notion of Article III standing in the equal protection context, we cannot say that Braunstein's standing argument, at least at the initial stages of this litigation, was

entirely frivolous or "wholly without merit." *See Gibson v. Office of Att'y Gen., State of Cal.*, 561 F.3d 920, 929 (9th Cir. 2009), *as amended* (internal quotation marks omitted). The district court was correct in concluding that Braunstein lacked Article III standing, but its emphasis on the fact that the challenged DBE participation goal was merely "aspirational" suggests that it may have thought our circuit precedent more strongly disfavored Braunstein than it actually does. *See Monterey Mechanical*, 125 F.3d at 711 (government programs are not "immunized from scrutiny because they purport to establish goals rather than quotas" (quoting *Bras*, 59 F.3d at 874)).

**[10]** Second, the district court appears to have made a mistake when it indicated that, because no federal funds were involved in the 2005 contract, there was "no basis for a damage claim under § 2000d." Title VI forbids discrimination under "any program or activity" receiving federal funds. 42 U.S.C. § 2000d. But it defines "program or activity" as including "all of the operations of" a state agency or department, "any part of which is extended Federal financial assistance." § 2000d-4a. Therefore, if he had Article III standing, Braunstein would have had a non-frivolous Title VI claim against the Department because the agency accepted and used federal funds in some of its operations, even if it did not use those funds in the challenged 2005 contract. *See Radcliff v. Landau*, 883 F.2d 1481, 1483 (9th Cir. 1989) (receipt of federal funding by any portion of a school subjects the entire school to Title VI coverage).

Finally, it is clear Braunstein's counsel did not understand sovereign immunity law under the Eleventh Amendment. Braunstein's complaint included several claims that were obviously barred by sovereign immunity. The district court correctly noted that it has been "well established for many years" that sovereign immunity precludes §§ 1981 and 1983 damages claims against state entities and state actors in their official capacity. More than 30 years ago, in *Quern v. Jordan*, 440 U.S. 332, 342-45 (1979), the Supreme Court held that

§ 1983 does not abrogate state sovereign immunity. *See also Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100-102 (1984) (sovereign immunity extends to state agencies and to damage claims against state officials acting in their official capacity); *Peters v. Lieuallen*, 693 F.2d 966, 970 (9th Cir. 1982) ("There is no doubt that suit under either §§ 1981 or 1983 against [a state agency is] barred by the Eleventh Amendment."). During oral argument in this court, Braunstein's counsel admitted that he was not familiar with *Quern.* Yet only months before Braunstein's counsel filed the present suit, the district court in *Western States* had cited *Quern* and these other authorities in ruling against another one of his clients on this very question. *See Western States Paving v. Wash. Dep't of Transp.*, 2006 WL 1734163, at *10 (W.D. Wash. June 23, 2006). The *Western States* court cited *Quern*, *Pennhurst*, and *Peters* and held that sovereign immunity "clearly prohibits" damages claims under §§ 1981 and 1983 against the Washington Department of Transportation and a department employee named in his official capacity. *Id.* Although the district court's ruling in *Western States* was not binding on Braunstein in the sense of issue preclusion, it certainly should have alerted his counsel to the existence of long-established Supreme Court precedent that precluded §§ 1981 and 1983 damages claims against the state, the Department, and the Named Defendants in their official capacity.

Although these specific claims may well have been frivolous, they were intertwined with other claims that were not. Congress abrogated state sovereign immunity for damages claims under § 2000d, and the §§ 1981 and 1983 damages claims against the Named Defendants in their individual capacity were not barred. Braunstein alleged all of these claims based on the same facts and in the same paragraph of his complaint. "Where, as here, the plaintiff seeks relief for violation of his civil rights under various legal theories based on essentially the same facts, and a number of his claims are not frivolous, the burden on the defendant to establish that fees are attributable solely to the frivolous claims is from a

practical standpoint extremely difficult to carry." *Harris*, 631 F.3d at 972. We conclude that Defendants in this case have not carried their burden of showing that they incurred attorneys' fees solely because of Braunstein's frivolous claims.

**[11]** In sum, this case is not one of those "exceptional circumstances" where a prevailing defendant may recover attorneys' fees under § 1988. We therefore reverse the district court's award of attorneys' fees under § 1988.

## 2. Sanctions

**[12]** Under § 1927, an attorney who unreasonably and vexatiously "multiplies the proceedings" in a case may be required to pay the excess fees and costs caused by such conduct. Unlike an award of attorneys' fees under § 1988, an award of sanctions under § 1927 "does not distinguish between winners and losers, or between plaintiffs and defendants." *Roadway Express., Inc. v. Piper*, 447 U.S. 752, 762 (1980). "Dilatory practices of civil rights plaintiffs are as objectionable as those of defendants." *Id.* "Recklessness suffices for § 1927 sanctions, but sanctions imposed under the district court's inherent authority require a bad faith finding." *Lahiri*, 606 F.3d at 1219.

**[13]** Here, the district court concluded that Braunstein's attorneys unnecessarily multiplied the proceedings by including §§ 1981 and 1983 claims barred by state sovereign immunity under the Eleventh Amendment and by pursuing § 2000d claims after it was clear that no federal funds were involved in the challenged contract. As discussed above, the district court erred when it concluded that Braunstein's § 2000d claim was "groundless" merely because federal funds were not used in the specifically challenged contract. Further, the district court quickly and correctly dismissed the claims barred by sovereign immunity at the outset of the litigation, so those claims did not vexatiously multiply the proceedings. Defendants conceded at oral argument that Braunstein's attorneys

did not file repetitive motions or generate an extraordinary volume of paperwork in this case. We therefore reverse the district court's imposition of sanctions under § 1927.

## Conclusion

We affirm the district court's holding that Braunstein lacks Article III standing to seek damages in this equal protection suit. Braunstein never demonstrated that the challenged affirmative action program affected him personally or impeded his ability to compete for subcontracting work. We reverse the award of attorneys' fees under § 1988 and the imposition of sanctions under § 1927. We award costs on appeal to Defendants.

**AFFIRMED** in part, **REVERSED** in part.